Thomas Hart FISHER et al., Appellants,

v.

Gilbert KERLIN, Appellee.

No. 12774.

Court of Civil Appeals of Texas.

San Antonio.

May 4, 1955.

Rehearings Denied June 1, 1955.

638

Cox, Wagner, Adams & Wilson, Brownsville, for appellants.

Davenport & Ransome, C. S. Eidman, Jr., Brownsville, for appellee.

POPE, Justice.

The following is substituted for our original opinion:

Two principal points are presented by this appeal. (1) Did a trust exist in favor of appellants, with reference to properties taken in the name of appellee? (2) If a trust did exist, what lands were held by appellee; as trustee for appellants? The trial court held that no trust existed and that appellants had no title to any lands in question. We reverse and render that judgment.

In 1941, Gilbert Kerlin filed a trespass to try title suit in Cameron County against the King Ranch, which is not a party to this suit, and appellants, for title to 6,000 acres of land located in the southern end of Padre Island. During the pendency of that suit, the United States Government commenced condemnation proceedings and took title to all of the lands involved in the suit between Kerlin, King Ranch, and appellants, and also took what we shall call the Jones lands, immediately to the north of the 6,000-acre tract.

Kerlin and King Ranch, during 1943, settled the trespass to try title suit as between themselves. On March 19, 1945, appellants, Edwin K. Atwood, Alice B. Atwood and Thomas Hart Fisher, hereafter called Atwoods, also settled the trespass to try title suit with Gilbert Kerlin. The Atwoods-Kerlin settlement agreement is set forth in the footnote, but the paragraph numbers and italics have been added for easier reference.[1]

By the terms of the settlement, Kerlin, individually and as trustee, assumed the duty of prosecuting Atwoods' claims for an award in the pending government condemnation proceeding. He fully managed all claims theretofore asserted by Atwoods, King Ranch, and himself, and during 1950 arranged a revesting of title to the lands instead of the payment of a cash award for the value of the lands. Kerlin, trustee, took title to all the revested lands.

1. The State of Texas
County of Cameron
    Know All Men By These Presents:
    (1) That Whereas, by Final Judgment rendered by the U. S. Circuit Court at Laredo, Texas, on November 16, 1905, in Cause C. L. 18, entitled "Maria Romula Salinas de Grisenti et al. v. The American Trust Company of New Jersey et al.," certain of the defendants in that suit recovered from the plaintiffs therein the title and possession of the whole of Padre Island, situated in the present Counties of Nueces, Kleberg, Kenedy, Willacy and Cameron, in the State of Texas, each recovering a specific and segregated part or parts of said Island; and by such judgment there was adjudged and set apart

The trial court refused Atwoods' claim for their share of the returned land, but upheld Kerlin's contentions, and construed the 1945 instrument to mean that if Kerlin, trustee, in the future should sell the tract, then he should account to Atwoods for their share of the proceeds from such sale. Atwoods urge that the 1945 instrument imposed upon Kerlin the obligation of handling their claim for an award, and that one-half of what was gained in the condemnation suit belonged to them.

to Mrs. H. M. King, one of said defendants, ."*a tract designated as 6,000 acres of land (but actually containing with its accretions a considerable excess over the stated figures)* lying immediately north of the south 1,500 acres of Padre Island" (therein adjudged and set apart to Mrs. Pauline J. Wells and Mrs. Eugenie R. Raphael), a certified copy of which judgment is recorded in Book "S", pp. 8–14 of the Deed Records of Cameron County, Texas; and thereafter the right, title and interest of Mrs. H. M. King in and to said tract of land passed to and vested in King Ranch, a private corporation under the laws of Texas, with its main office in Kleberg County, Texas, and in the grantors hereinafter named;

(2) And Whereas, on August 8, 1941, Gilbert Kerlin, claiming to own the whole of said 6,000 acre tract, as adjudged to Mrs. H. M. King, aforesaid, brought suit in the District Court of Cameron County, Texas, 103rd Judicial District, in Cause No. 18,987, styled "Gilbert Kerlin v. King Ranch et al.," against the said King Ranch and Alice B. Atwood, Edwin K. Atwood and Richard W. Atwood, of the grantors herein, to recover said tract; which suit the parties thereto have for some time desired to compromise and settle;

(3) And Whereas, after the institution of said suit, to-wit on September 20, 1941, a condemnation suit or proceeding was brought in the U. S. District Court for the Southern District of Texas, Brownsville Division, under the number and style of Civil Action 142, "United States of America, Petitioner, vs. 34,884 acres of land, more or less, situated in Cameron County, Texas, and South Padre Island, Inc., et al., Defendants," which suit is still pending upon an Amended Declaration of Taking and Judgment of the court thereon, whereby the whole of *said 6,000 acre tract with other lands adjoining it on Padre Island, all situated in Cameron County, Texas, was taken for public purposes of the Government of the United States of America, and commissioners were appointed to fix and appraise the damage from such taking; but said commissioners have not as yet made their award or concluded their hearings;*

(4) And Whereas, subsequently, on June 9, 1943, the said King Ranch, a corporation as aforesaid, made and entered into an agreed settlement, as between it and the said Gilbert Kerlin, of their mutual disputes and claims in said Cause No. 18,987, and to that end executed and delivered to the said Gilbert Kerlin a quitclaim deed bearing that date and recorded in Book 331, pp. 3–6 of the Deed Records of Cameron County, Texas, conveying to the said Gilbert Kerlin all its right and interest in and to said 6,000 acre tract, on certain terms and for certain considerations therein expressed, *together with full right to receive and receipt for the proceeds payable to it from the condemnation of said premises,* etc., and to divide same between himself and said King ranch in the proportions and manner therein described, etc., all as fully stated in said quitclaim deed; to which and its record reference is now here made for greater certainty;

(5) *And Whereas, it is desired by and between the said Gilbert Kerlin and the grantors herein to effect a similar settlement of their mutually adverse claims in and to the said 6,000 acre tract with accretions and the proceeds of the condemnation thereof;*

(6) Now, Therefore, for and upon the consideration hereinbefore mentioned, the dismissal at Plaintiff's cost of said Cause No. 18,987, and *the distribution and division of the proceeds of said lands,* as hereinafter provided, and the special consideration hereinafter mentioned, the grantors herein, namely, Alice B. Atwood, and Edwin K. Atwood, residents of the City of Chicago, Illinois, each acting in his own behalf, Mrs. Elizabeth A. Baldwin, joined by James R. Baldwin, her husband, the said Alice B. Atwood, acting as Conservatrix of the Estate of Richard W. Atwood, thereto appointed by the Probate Court of Cook County, Illinois, and acting herein under and pursuant to an order of that court (a certified copy of which order will be hereto attached and is made part hereof), B. D. Tarlton, a resident of Nueces County, Texas, acting as Guardian of the Estate of said Richard W. Atwood, thereto appointed by the County Court of Willacy County, Tex-

A simplified statement of Kerlin's contention is that he was obligated to Atwoods to press for a money award, a part of which would be theirs; he failed to do that, and instead pressed for and obtained a return of land; therefore, at this time, he owes Atwoods neither land nor money. Kerlin contends he owes them money only if and when he sells the land.

The 1945 instrument must be examined. Paragraph (3) recites that the lands had already been taken by the government, that

as, and acting under and purusant to an order of that court (a certified copy of which order will be hereto attached and is made part hereof) and Thomas Hart Fisher, Esquire, of Chicago, Illinois, Have Released, Remised, and Quitclaimed, and do by these presents Release, Remise and Quitclaim unto the said Gilbert Kerlin, *Trustee*, who is a resident of the City of New York, but is now in the United States Army and stationed at Washington, D. C., all of the right, title and interest of the above named grantors whether divided or undivided, or both, in and to the whole and every part of said Padre Island, *including particularly the tract of 6,000 acres, more or less*, so adjudicated and set apart to Mrs. H. M. King by the judgment first herein mentioned.

(7) To Have And To Hold the said premises unto the grantee, Gilbert Kerlin, Trustee, his heirs and assigns forever, free and quit of every claim of them, the grantors, in and to the same, Subject However, to a vendor's lien which is hereby retained to secure the payment of the special consideration hereinafter described.

(8) The aforesaid grantors do furthermore hereby Assign And Transfer unto the said Gilbert Kerlin, Trustee, *whatever amount of compensation or damages shall be allowed in said Civil Action No. 142 for the taking of the lands heretofore held or claimed by the said grantors* and now hereby conveyed to the said Gilbert Kerlin, Trustee, or any part or parts thereof; and he is hereby vested with full right and power *to receive and receipt for same* and *to prosecute all claims in connection with the determination of the amount of the award and the recovery thereof*, without the necessity of the joinder of grantors, or any of them, therein.

(9) The *proceeds of the award so made, or damages so recovered*, shall be paid over by Gilbert Kerlin, forthwith on their receipt, to the grantors, or to such person or persons as may then be authorized to receive same on their behalf, *to the extent of an equal one-half (½) of the sums of money so paid as compensation or damages for the lands or interests in*

*lands hereby conveyed to Gilbert Kerlin, Trustee*, after first deducting all costs of such condemnation suit and proceedings that shall have been adjudged against grantors or Gilbert Kerlin, Individually or as Trustee, *as arising out of the condemnation of the land hereby conveyed*, and also all witness fees and the actual and reasonable expenses of procuring written evidence and the testimony of *witnesses regarding the value of the land condemned in that proceeding*—this expense item not to include the expense of procuring or presenting evidence of title or ownership or evidence on other issues or matters than purely the *value of said land*. It is agreed between the parties that such expense in proving the *value of said land* shall not exceed Three Hundred ($300.00) Dollars, and only one-half (½) thereof is chargeable to grantors herein.

(10) Gilbert Kerlin, Trustee, is vested with the full control and management of said *condemnation proceedings as to the land and interest in land heretofore claimed by him and grantors*, respectively, and now quitclaimed to him by them, same to be handled by counsel employed by him at his sole expense; *but any money or other thing of value received by him by virtue of an award in said Civil Action No. 142, or by virtue of any other judicial proceedings, or by voluntary settlement or conveyance, same being for and on account of any land and interest in land heretofore claimed by said grantors*, and to which they have now quitclaimed their interests by this instrument, shall be applied solely as hereinbefore provided; and there shall be no personal liability upon the said Gilbert Kerlin, Trustee, except for a due accounting and division of the moneys actually received by him on that account.

(11) If the oil, gas, or other minerals in and/or under the lands covered by this quitclaim should be excepted from the government's taking of title in said Civil Action No. 142, or should be returned by the United States Government to the persons from whom the land is taken, the grantors shall have, and they hereby reserve, jointly, a one-sixteenth (1/16) free royalty therein; that is to say, a one-

commissioners were appointed to appraise the damages, but they had not yet made an award. Paragraph (4) recites that King Ranch had already settled with Kerlin, by which Kerlin would have "full right to receive and receipt for the proceeds payable to it from the condemnation of said premises and to divide same between himself and said King Ranch * * *." Paragraph (5) recites the desire of Kerlin and Atwoods to make a similar settlement. Paragraph (8) empowered Kerlin "to prosecute all claims in connection with the determination of the amount of the award and the recovery thereof * * *." Paragraph (9) stated the proportion in which Kerlin and Atwoods would share in "the sums of money so paid as compensation or damages for the lands or interest in lands hereby conveyed to Gilbert Kerlin, Trustee * * *." The same paragraph goes further and provides that Kerlin, Trustee, could deduct certain costs incident to his necessary proof of the value of the lands.

sixteenth (1/16) of all the oil, gas, and other minerals produced and saved therefrom under the terms and in the operation of oil, gas, and/or mineral leases hereafter from time to time to be executed by Gilbert Kerlin, Trustee, his heirs or assigns, without the joinder of these grantors, or any of them, covering the whole or any part of said lands, and providing for payment or delivery directly to these grantors of such part of the royalties specified in each such lease as shall be equal to said one-sixteenth (1/16) of all the oil, gas, and other minerals produced and saved under such lease from the land thereby covered.

(12) These grantors shall have, in addition, the right of participation, to the extent of an equal one-half (½) to them jointly, in all bonuses given for such leases, and in all payments made as rentals or renewal rentals; but the consent of them or any of them shall not be necessary and shall not be required to the execution, extension, termination or cancellation in whole or in part of any such lease—all of which shall be done and performed solely by the said Gilbert Kerlin, Trustee—the only right of these grantors under this and the preceding paragraph (Initials: THF, EKA, ABA,) being to receive from the lessees the aforesaid payments or deliveries out of the royalties from production, and to receive from the said Gilbert Kerlin, Trustee, the equal one-half (½) of all such bonuses, rentals (Initials: THF, EKA, ABA,) and renewal rentals received by him.

(13) It is expressly understood and agreed that the vendor's lien shall be, and it is hereby, retained upon all the rights and interests hereby conveyed until full payment by grantee to grantors of the special consideration hereinbefore expressed, whereupon these presents shall become absolute.

(14) The grantors have joined together in the execution of this instrument, notwithstanding certain controversies existing or threatened among themselves, *for the sole purpose of settling the disputed title to said lands as between themselves, on the one hand, and Gilbert Kerlin, individually and as Trustee, on the other.* Nothing herein contained shall be considered as admission on the part of any of said grantors that the Probate Court of Cook County, Illinois, or the Probate Court of Willacy County, Texas, possesses lawful jurisdiction of the Estate of said Richard W. Atwood, nor an admission against interest as to any of the facts hereinbefore stated. It is agreed by and between them, the said grantors, *that their respective claims and rights in, to, and in respect of said lands, shall hereafter be limited to, and satisfied out of, the payments of money, deliveries of oil and other benefits resulting from the performance of this contract by Gilbert Kerlin,* Trustee; and that distribution thereof shall be made among them, their heirs and assigns, in the proportions of their respective interests or rights in the lands hereby conveyed as the same existed at the time of the delivery of these presents.

(15) In Testimony Whereof, the parties have hereto set their hands at Chicago, Illinois, on this the 19th day of March, 1945.

Edwin K. Atwood
Alice B. Atwood.
Thomas Hart Fisher
Alice B. Atwood
As Conservatrix of the Estate
of Richard W. Atwood distracted.

The said Gilbert Kerlin accepts the foregoing conveyance and assumes all of the obligations therein provided for him.
(Initials: THF, EKA, ABA.)
Gilbert Kerlin (Seal)
Individually and as Trustee as Aforesaid.

The above matters show that the parties contemplated that Kerlin, Trustee, in the performance of his obligations, would seek a money award. Paragraph (10) again vested Kerlin, Trustee, with full control and management of the condemnation suit, but then significantly provided: *"but any money or other thing of value received* by him by virtue of an award in said Civil Action No. 142, or by virtue of any other judicial proceedings *or by voluntary settlement* or conveyance, same being for and on account of any land and interest in land heretofore claimed by said grantors * * shall be applied solely as hereinbefore provided * * *." Paragraph (14) provided:

"It is agreed by and between them, the said grantors, *that their respective claims and rights* in, to, and in respect of said lands, *shall hereafter be limited to, and satisfied out of,* the payments of money, deliveries of oil and *other benefits resulting from the performance of this contract* by Gilbert Kerlin, Trustee."

At the time this instrument was executed the government had already taken the legal title to the property. 40 U.S.C.A. Chapter 3, § 258a; United States v. 53¼ Acres of Land, 2 Cir., 176 F.2d 255; United States v. .8677 Acre of Land, D.C., 42 F.Supp. 91. Atwoods at that point had a claim to some part of the award deposited by the government for the land. To protect that claim, Atwoods by paragraph (13) of the instrument undertook to reserve a vendor's lien upon "all the rights and interest hereby conveyed." That reservation is seized upon by Kerlin as destructive of an express trust, it being a reservation of the legal title. There probably was no legal title upon which the vendor's lien could then operate, since the legal title was already in a third person, the government. Moreover, Kerlin eradicated the vendor's lien by his trade with the government by which Atwoods received nothing. If there were a reservation of the legal title in the form of the vendor's lien, then Atwoods would be entitled to judgment for one-half of their lands for that reason. Collins v. Republic

Nat. Bank of Dallas, 152 Tex. 392, 258 S.W.2d 305; Yates v. Darby, 133 Tex. 593, 131 S.W.2d 95; Barker v. Temple Lumber Co., 120 Tex. 244, 37 S.W.2d 721; Johnson v. Smith, 115 Tex. 193, 280 S.W. 158; 41 Tex.Jur., Trespass to Try Title, § 19.

■ We rest our decision upon a constructive trust rather than an express trust. Kerlin assumed and recognized certain duties toward Atwoods with reference to the protection of their rights and interest. Atwoods, by the settlement instrument, certainly had rights to and interests in something out of the award. What happened to their rights, and how did they disappear? Atwoods empowered Kerlin to protect those rights and interests, and he exchanged them for land in lieu of cash. He took the land in his own name. Kerlin, by changing a prayer for cash to a prayer for land, claims that Atwoods now own neither cash nor land. He urges that by his surrendering rather than prosecuting Atwoods' claims, their rights are lost.

■ A constructive trust is raised by construction of equity and not by intent, actual or presumed. Lipsitz v. First National Bank, Tex.Com.App., 293 S.W. 563, 567. Chief Justice Smith, speaking for this Court, in Gates v. Coquat, Tex.Civ. App., 210 S.W.2d 614, 615, stated:

"There are no set and rigid rules as to constructive trusts. Pomeroy states that;

" 'Equity has followed the true principle of contriving its remedies so that they shall correspond both to the primary rights of the injured party, and to the wrong by which that right has been violated. It has, therefore never placed any limits to the remedies which it can grant, either with respect to their substance, their form, or their extent; but has always preserved the elements of flexibility and expansiveness, so that new ones may be invented, or old ones modified, in order to meet the requirements of every case, and to satisfy the needs of a progressive social condition, in which new primary rights

and duties are constantly arising, and new kinds of wrongs are constantly committed.' 1 Pomeroy, Equity Jurisprudence, 5th Ed., 143, § 111.

"In Beatty v. Guggenheim Exploration Co., 225 N.Y. 380, 381, 122 N.E. 378, 381, Mr. Justice Cardoza said:

" 'A court of equity in decreeing a constructive trust is bound by no unyielding formula. The equity of transaction must shape the measure of the relief.' ".

Cawthon v. Cochell, Tex.Civ.App., 121 S.W.2d 414, 416, states:

"In the class of cases to which this case belongs, an accurate definition would be that it is a trust which is not expressed but is imposed upon a person by a court of equity upon the ground of public policy so as to prevent him from holding for his own benefit and advantage that which he has gained by reason of a fiduciary relation subsisting between him and those for whose benefit it is his duty to act."

Such use of another's property gives rise to a constructive trust on the principles stated in 4 Pomeroy, Equity Jurisprudence, 5th Ed., § 1051, which states:

" * * * A constructive trust arises whenever another's property has been wrongfully appropriated and converted into a different form. If one person having money or any kind of property belonging to another in his hands wrongfully uses it for the purchase of lands, taking title in his own name; or if a trustee or other fiduciary person wrongfully converts the trust fund into a different species of property, taking to himself the title; or if an agent or bailee wrongfully disposes of his principal's securities, and with the proceeds purchases other securities in his own name,—in these and all similar cases equity impresses a constructive trust upon the new form or species of property, not only while it is in the hands of the original wrong-doer, but as long as it can be followed and identified in whosoever hands it may come, except into those of a *bona fide* purchaser for value and without notice; and the court will enforce the constructive trust for the benefit of the beneficial owner or original *cestui que trust* who has thus been defrauded. * * *

"It is not essential for the application of this doctrine that an actual trust or fiduciary relation should exist between the original wrong-doer and the beneficial owner. Wherever one person has wrongfully taken the property of another, and converted it into a new form, or transferred it, the trust arises and follows the property of its proceeds."

These principles are the law of Texas. Fitz-Gerald v. Hull, 150 Tex. 39, 237 S.W. 2d 256; Schiller v. Elick, 150 Tex. 363, 240 S.W.2d 997; Binford v. Snyder, 144 Tex. 134, 189 S.W.2d 471; Dority v. Dority, 96 Tex. 215, 71 S.W. 950, 60 L.R.A. 941; Richardson v. Hutchins, 68 Tex. 88, 3 S.W. 279; Mellette v. Hudstan Oil Corp., Tex. Civ.App., 243 S.W.2d 438; Jarrett v. Hall, Tex.Civ.App., 207 S.W.2d 261; Pounds v. Jenkins, Tex.Civ.App., 157 S.W.2d 173; Hall v. Miller, Tex.Civ.App., 147 S.W.2d 266. See also, Restatement, Restitution, §§ 194, 202.

To overcome the effect of the instrument, appellee argues and the trial court concluded, that the use of the word "Trustee" in the 1945 instrument is descriptive only. Whether Kerlin's title of "Trustee" was descriptive is immaterial, for the constructive trust would arise, though the word had been entirely eliminated from the instrument. "A constructive trust is a relationship with respect to property subjecting the person by whom the title to the property is held to an equitable duty to convey it to another on the ground that his acquisition or retention of the property is wrongful and that he would be unjustly enriched if he were permitted to retain the property. * * * On the other hand, a constructive trust is imposed, not to effectuate intention, but to redress

wrong or unjust enrichment. A constructive trust is remedial in character." Restatement, Trusts, Sec. 1e.

The second problem presented by the appeal is a determination of the lands to which the trust exists in favor of Atwoods. To determine this matter it becomes necessary for us to make further explanation of the nature of the dispute between the parties which was merged in the settlement agreement. The lands are all a part of Padre Island, a long, narrow island, which extends some 110 miles along the Texas Coast, from Corpus Christi Pass, on the north, to the Pass of Brazos de Santiago, on the south. The Atwoods' claim to these lands was under the title of Mrs. Henrietta M. King. In 1905 a judgment by the Federal Court set aside to Mrs. King "a tract designated as 6,000 acres of land out of what is known as the Southern Division of said tract of Island, and to be segregated and adjoin 1500 acres segregated and set apart on the extreme South end of said Island or tract to Pauline J. Wells and Eugenie R. Raphael and between the Gulf of Mexico and Languna Madre." This 6,000 acre tract is known as the King tract. All parties concede that the 1500 acres in the extreme southern tip of the island, being bounded on three sides by natural objects, can be and has been readily located by fixing the northern boundary at such point as will include 1500 acres. That tract is not involved in this suit. Working northward, the 6,000 acres mentioned in the Federal Court judgment may also be easily located, the southern boundary being the northern boundary of the 1500 acre tract, the east and west boundaries being the Gulf of Mexico and Laguna Madre, and the northern boundary being at such point as would include 6,000 acres.

In 1935, after Mrs. King's death, her trustees partitioned the properties of her estate among the beneficiaries under her will. The trustees set over to King Ranch, a Texas Corporation, the north five-eighths of the 6,000 acre King tract. They set over to Atwoods the south three-eighths of the same tract. In 1941 Kerlin filed his suit against both the King Ranch and the Atwoods and claimed the same lands that had been set over to the Atwoods and King Ranch. Kerlin separately settled his claim against the King Ranch on June 9, 1943, as recited in paragraph (4) of the instrument under construction. He then settled his claim against the Atwoods on March 19, 1945. While there are differences in the wording of the two settlement instruments, they are similar in some respects.

Atwoods urge that, looking to the Atwood-Kerlin settlement instrument now under construction, they are entitled to one-half of all lands returned by the government. To give the instrument, including its recitals about the King Ranch settlement, such a construction would mean that King Ranch is entitled to one-half, Atwoods are entitled to one-half, and Kerlin is entitled to two halves, a total of four halves. The recitals in the instrument about the separate settlement with King Ranch require that we consider that instrument in determining the intent, and when we do so the construction urged by Atwoods becomes a mathematically impossible one.

The difficulty is resolved when we look to other controlling facts. At the time these two settlements were made with Kerlin, King Ranch and the Atwoods were engaged in a separate suit between themselves. The Atwoods had sued the King Ranch in Federal Court for the purpose of setting aside the 1935 partition which awarded King Ranch the north five-eighths and the Atwoods the south three-eighths of the 6,000 acre King tract. In other words, when Kerlin settled with King Ranch in 1943, and later with Atwoods in 1945, all parties knew that the partition of the 6,000 acre King tract between King Ranch and Atwoods was in litigation and, until concluded, the parties would not know the respective rights of King Ranch and Atwoods to the 6,000 acre tract. The fact that both King Ranch and Atwoods settled with Kerlin, did not conclude the separate dispute between King Ranch and Atwoods over what lands each owned out of the 6,000 acre tract. That matter was left for decision by the Federal Court where the matter was then pending. That suit was

concluded in 1947, some two years after the Atwood-Kerlin settlement.

With this background, when Atwoods settled with Kerlin they knew, from the recitals in the instrument, which referred to the separate King Ranch-Kerlin settlement, that King Ranch would also receive one-half of something out of the condemnation suit. They knew further that they, the Atwoods, would receive one-half of something. Atwoods also knew that by settling with Kerlin there was no settlement of the separate Federal court case against King Ranch. Atwoods continued on with that separate suit to determine what King Ranch owned and what Atwoods owned out of the 6,000 acre King tract. When that fact was determined by the Federal court case, then the parties knew for the first time what part of the 6,000 acre King tract belonged to King Ranch and what part belonged to Atwoods under the 1935 partition.

■ The instrument, to be understood, must be read and construed with its recitals about the separate King Ranch settlement with Kerlin. 12 Am.Jur., Contracts, § 245; 10 Tex.Jur., Contracts, § 167. When that is done, we avoid a construction which is extraordinary and impossible of interpretation, and the 1945 settlement is capable of a fair and reasonable understanding. That construction shows that the parties intended that King Ranch would receive one-half of what the Federal Court in the condemnation suit should award King Ranch out of the 6,000 acre King tract; Atwoods would receive one-half of what the Federal Court should award them, and the balance would go to Kerlin. Such a construction harmonizes the instruments and makes the 1945 instrument reasonable, comprehensible and possible. Guadalupe-Blanco River Authority v. City of San Antonio, 145 Tex. 611, 200 S.W.2d 989, 1000.

Under such a construction, Atwoods would receive one-half of what they conveyed. Their interest was in the south three-eighths of the described 6,000 acre tract, but the Baldwins (not parties to this suit) owned ⅛th of that tract also. Hence

Atwoods would recover one-half of eight-ninths of the south three-eighths of the described 6,000 acres. Reducing the fraction, they would recover the south one-sixth of the 6,000 acre tract, or 1,000 acres. Since they conveyed the south 2,000 acres out of the described 6,000 acre tract, and since their claim against the government was for an award for that property, they must recover their 1000 acres out of the south 2000 acres.

Atwoods are entitled to recover still other lands, however. From the above fraction, it is shown that Atwoods are entitled to one-sixth of the lands recovered by Kerlin from the government. In addition to the 6,000 acres described and discussed above, Atwoods also conveyed to Kerlin under the settlement agreement their claims to additional excess lands to the north of the 6,000 acre tract. They are entitled to one-sixth of such excess lands which Kerlin received from the government. The 1935 partition of the 6,000 acre King tract, which was confirmed by the Federal suit between Atwoods and King Ranch in 1947, set the north five-eighths of the tract over to King Ranch and the south three-eighths over to Atwoods. In 1941, as a part of and incident to the case of State v. Balli, 144 Tex. 195, 190 S.W.2d 71; Id., Tex.Civ.App., 173 S.W.2d 522, a survey was made of Padre Island and it was learned that the Island contained 135,-213.03 acres, rather than 49,913.5 acres. By reason of this discovery of a large excess, Atwoods claimed they were entitled to their proportionate part of the excess.

We conclude that the 1945 settlement contemplated that Atwoods contracted with reference to their proportionate part of the excess, for the following reasons: (1) The recitals in paragraph one decribe the property as "a tract designated as 6,000 acres of land *(but actually containing, with its accretions, a considerable excess over the stated figures)* * * *." (2) The recitals in paragraph three again describe the lands as "said 6,000 acre tract *with other lands adjoining it on Padre Island.*" (3) Paragraph five recites that "it is desired by and between the said Gilbert Kerlin and

the grantors herein to effect a similar settlement of their mutually adverse claims in and to the said 6,000 acre tract *with accretions* * * *." (4) Paragraph six quitclaimed to Kerlin *"the whole and every part of said Padre Island,* including particularly the tract of 6,000 acres, *more or less,* so adjudicated and set apart to Mrs. H. M. King by the judgment first herein mentioned." (5) Paragraph eight assigned and transferred "whatever amount of compensation or damages shall be allowed in said Civil Action No. 142 for the taking of the lands heretofore *held or claimed* by the said grantors." (6) Paragraph eight further vested Kerlin, Trustee, with power "to receive and receipt for same and to *prosecute all claims* in connection with the determination of the amount of the award * * *." (7) Paragraph nine obligated Kerlin to pay over to Atwoods an "equal one-half (½) of the sums of money so paid as compensation or damages for the *lands or interests in land* hereby conveyed to Gilbert Kerlin, Trustee * * *." (8) Paragraph ten vested Kerlin, Trustee, with "control and management of said condemnation proceedings as to the *land and interest in land* heretofore claimed by him and grantors, respectively." (9) Paragraph ten further provided "but any money or other thing of value received by him by virtue of an award in said Civil Action No. 142, or by virtue of any other judicial proceedings, or by voluntary settlement or conveyance, *same being for and on account of any land and interest in land heretofore claimed by said grantors* * * *." (10) Paragraph fourteen provides, "It is agreed by and between them, the said grantors, that their respective *claims and rights in, to, and in respect of said lands,* shall be limited to, and satisfied out of, the payments of money * * *."

These provisions demonstrate that the Atwoods conveyed and assigned not only their interest in 6,000 described acres but also their claims, whether they were good or bad claims, to other parts of Padre Island, including any excess lands. After Kerlin received under the settlements, whatever interest the King Ranch had and also whatever interest the Atwoods had, he asserted those rights not only against the government for an award in its condemnation suit, but also against the Jones interests who claimed property to the north. In doing this, Kerlin, under the record, relied upon the same title and claim that King Ranch and Atwoods had conveyed and assigned to him and nothing else. If Kerlin formerly had any other rights to the excess lands to the north, according to the record, he had previously quitclaimed them to the Jones family. At the time he commenced the performance of his obligations under the 1945 settlement agreement, he asserted against the Jones interests and the government, the right to excess land that he had obtained through King Ranch and Atwoods.

Paragraph (10) of the instrument defined what Atwoods would be entitled to receive out of the condemnation in these words, which are important enough for us to repeat again: "but any money or other thing of value received by him by virtue of an award in said Civil Action No. 142, *or* by virtue of any other judicial proceeding, *or* by voluntary settlement *or* conveyance, *same being for and on account of any land and interest in land heretofore claimed by said grantors, and to which they now quitclaimed their interests by this instrument,* shall be applied solely as hereinbefore provided * * *."

Relying upon the same Atwoods' theory and claim of a right to their proportionate share of the excess lands, Kerlin, Trustee, asserted a right to the excess lands involved in the condemnation suit. Those excess lands were claimed also by the Jones interests. Kerlin, Trustee, and Jones settled the claim. By the settlement, Kerlin, Trustee, received an additional 3,300.11 acres of land. Kerlin, by asserting the rights derived through the King Ranch and Atwoods settlements, obtained that additional acreage by settlement. That settlement was by joint motion of Kerlin, Trustee, and Jones called to the attention of the Special Master in the condemnation suit, who had been named by the Federal

Court to determine the state of the title. The Master included the settlement in his report, and the Federal Court entered its judgment in the condemnation suit revesting title in the private owners upon that basis.

Kerlin urges many reasons why the Atwoods claim to excess lands was not legally well grounded. Since Atwoods, on the one hand, and Kerlin, on the other, settled their suit on a basis that they would share in such excess lands as might be recovered by Kerlin, the question is not whether the claim was good or bad, valid or invalid, but whether it was good enough to obtain some of the excess lands. Kerlin asserted against the government and the Jones interest, the identical claim that King Ranch and Atwoods asserted before the settlement. Kerlin pressed the claim and obtained an additional 3,300.11 acres of land. When Atwoods and Kerlin in 1945 made their agreement, they were settling their lawsuit. We shall not now try it to determine whether Atwoods could have recovered excess lands in a lawsuit. The point is that Kerlin agreed to press the Atwoods claim, he did, he was successful, and he recovered additional lands. The rights of the parties are controlled by the settlement agreement. Frenkil v. Silver, Tex.Civ.App., 197 S.W.2d 127; Valley Developments v. Lamb, Tex.Civ.App., 53 S.W.2d 686; Tyrell Rice Milling Co. v. McFaddin-Wiess-Kyle Land Co., Tex.Civ. App., 32 S.W.2d 393; 15 C.J.S., Compromise and Settlement, § 24.

Paragraph (10) of the settlement instrument declared that the Atwoods rights should extend to "any money or *other thing of value* received by him (Kerlin, Trustee), by virtue of an award in said Civil Action No. 142, or by virtue of any other judicial proceedings, or by voluntary settlement or conveyance, same being for and on account of any land and interest in land heretofore claimed by said grantors * * *." Kerlin, Trustee, received the excess lands by virtue of the award, by voluntary settlement, and he received the lands for and on account of the land and interest in land theretofore claimed by Atwoods. The clause is decisive of Atwoods' rights not only to their share of the 6,000 acres but also to their proportionate excess, for everything Kerlin, Trustee, received from the government was a thing of value. Out of the 3,300.11 excess acres received by Kerlin, Trustee, their part of that which is "for and on account of any land and interest in land heretofore claimed by grantors," is one-sixth of 3,300.11, or 550 acres.

The trial court refused to impress a trust in favor of Atwoods with respect to any lands, but held that Atwoods should receive the proceeds from 1,000 acres of land out of the south 2,000 acres of the King 6,000 acre tract, if and when Kerlin sells the tract.

We render judgment that Atwoods recover an undivided 1,000 acres out of the south 2,000 acres of the described 6,000 acre King tract, and that Atwoods recover an undivided 550.1 acres out of the 3,300.11 acre tract north of the described 6,000 acre King tract.

Under paragraph (11) and (12) of the settlement instrument, we render judgment that Atwoods recover a one-sixteenth royalty and one-half of the bonuses and rentals paid on the south 2,000 acres of the 6,000 acre King tract.

The trial court refused to award Atwoods any royalty, bonus, or rentals paid on the excess lands north of the 6,000 acre King tract. The instrument demonstrates that in dealing with the surface, Atwoods agreed to take one-half of their lands. In dealing with the sub-surface, they cut down on their royalty and rentals but reserved royalty and rentals on all the lands they conveyed. Hence, while they recovered only 550.1 surface acres, we hold that they recover the one-sixteenth royalty and one-half of the bonus and rentals paid on the undivided ⅝ths of ⅜ths of 3,300.11 excess acres, that being an undivided 1,100.3 acres out of the 3,300.11 acres north of the 6,000 acre King tract.

The judgment is accordingly reversed and rendered.